IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

L.I., individually and on            )    CIVIL NO. 10-00731 SOM/BMK
behalf of her minor child,           )
E.Y.,                                )    ORDER AFFIRMING THE DECISION
                                     )    OF THE ADMINISTRATIVE
         Plaintiffs,                 )    HEARINGS OFFICER
                                     )
    vs.                              )
                                     )
STATE OF HAWAII, DEPARTMENT          )
OF EDUCATION and KATHRYN             )
MATAYOSHI, in her official           )
capacity as Acting                   )
Superintendent of the Hawaii         )
Public Schools,                      )
                                     )
         Defendants.                 )
_____      )

ORDER AFFIRMING THE DECISION OF
THE ADMINISTRATIVE HEARINGS OFFICER

I.       INTRODUCTION.

         Plaintiff L.I., proceeding individually and on behalf

of her son, E.Y, seeks reversal of the Findings of Fact,

Conclusions of Law and Decision ("Decision") issued by the

Administrative Hearings Officer ("AHO") regarding whether

Defendants Department of Education for the State of Hawaii and

Superintendent Kathryn Matayoshi (collectively, the "DOE") denied

E.Y. a Free and Appropriate Public Education ("FAPE") as required

by the Individuals with Disabilities Education Act ("IDEA").

         L.I. makes two arguments.  First, she argues that the

Individualized Education Program ("IEP") for her son, dated

January 13, 2010, was substantively flawed because it did not

provide a transition plan that could have been implemented when

the IEP took effect on January 14, 2010.  Second, L.I. contends

that the IEP was procedurally flawed because the DOE did not end

the IEP meeting of January 13, 2010, even after L.I. had to

leave.  As L.I. herself caused the alleged deficiencies, this

court affirms the AHO's decision.

II.      STATUTORY FRAMEWORK.

        "The IDEA is a comprehensive educational scheme,

conferring on disabled students a substantive right to public

education."  Hoeft v. Tucson Unified Sch. Dist., 967 F.2d 1298,

1300 (9th Cir. 1992) (citing Honig v. Doe, 484 U.S. 305, 310

(1988)).  The IDEA ensures that "all children with disabilities

have available to them a free appropriate public education that

emphasizes special education and related services designed to

meet their unique needs and prepare them for further education,

employment, and independent living."  20 U.S.C. § 1400(d)(1)(A).

        According to the IDEA, a Free and Appropriate Public

Education ("FAPE") consists of:

> special education and services that-
>
> (A) have been provided at public expense,
> under public supervision and direction, and
> without charge;
>
> (B) meet the school standards of the State
> educational agency;
>
> (C) include an appropriate preschool,
> elementary school or secondary school
> education in the State involved; and

(D) are provided in conformity with the
individualized education program required
under section 1414(d) of this title.

20 U.S.C. § 1401(9).  To provide a FAPE in compliance with the

IDEA, a state educational agency receiving federal funds must

evaluate a student, determine whether that student is eligible

for special education and services, conduct and implement an IEP,

and determine an appropriate educational placement for the

student.  20 U.S.C. § 1414.

The student's FAPE must be "tailored to the unique

needs of the handicapped child by means of an . . . IEP."  Bd. of

Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S.

176, 181 (1982) ("Rowley") (citing 20 U.S.C. § 1401(18)).  The

IEP, which is prepared at a meeting between a qualified

representative of the local educational agency, the child's

teacher, the child's parents or guardian, and, when appropriate,

the child, consists of a written document containing:

(i) A statement of the present levels of
educational performance of the child;

(ii) A statement of annual goals, including
short-term instructional objectives;

(iii) A statement of the specific educational
services to be provided to the child, and the
extent to which the child will be able to
participate in regular educational programs;

. . . .

(v) The projected date for initiation and
anticipated duration of these services; and

3

> (vi) Appropriate objective criteria and
> evaluation procedures and schedules for
> determining on at least an annual basis,
> whether instructional objectives are being
> achieved.

34 C.F.R. § 222.50; see also 20 U.S.C. § 1414(d).  Local or regional educational agencies must review and, when appropriate, revise each child's IEP at least annually.  20 U.S.C. § 1414(d)(4).  A school district must have an IEP in effect for each child with a disability at the beginning of each school year.  See 20 U.S.C. § 1414(d)(2)(A); 34 C.F.R. § 300.323(a).  "Parental involvement is a central feature of the IDEA."  Hoeft, 967 F.2d at 1300.  "Parents participate along with teachers and school district representatives in the process of determining what constitutes a 'free appropriate education' for each disabled child."  Id.

Violations of the IDEA may arise in two situations. First, a school district, in creating and implementing an IEP, may run afoul of the IDEA's procedural requirements.  Rowley, 458 U.S. at 205-06.  Second, a school district may become liable for a substantive violation of the IDEA by drafting an IEP that is not reasonably calculated to enable the child to receive educational benefits.  Id. at 206-07.  The district must provide the student with a FAPE that is "appropriately designed and implemented so as to convey" to the student a "meaningful" benefit.  Adams v. Oregon, 195 F.3d 1141, 1149 (9th Cir. 1999).

4

While the IDEA guarantees certain procedural safeguards for children and parents, the Ninth Circuit has recognized that not every procedural violation results in denial of a FAPE.  See e.g., L.M. v. Capistrano Unified Sch. Dist., 556 F.3d 900, 909 (9th Cir. 2009)("Procedural flaws in the IEP process do not always amount to the denial of a FAPE.").  Procedural flaws in the IEP process only deny a child a FAPE when the flaws affect the "substantive rights" of a parent or child.  Id.  Such substantive rights include the loss of a child's educational opportunity or an infringement on a parent's opportunity to participate in the IEP process.  Id.

When a public school fails to provide a FAPE, and a parent establishes that placement at a private school is appropriate, the IDEA authorizes reimbursement.  See 20 U.S.C. § 1412 (a)(10)(C)(ii); Sch. Comm. of Burlington v. Dep't of Ed. of Mass., 471 U.S. 359, 370 (1985).  In addition, the IDEA includes a "stay put" provision that permits a child to stay in the child's current educational placement during the pendency of any administrative or judicial proceeding regarding a due process complaint notice.  See 20 U.S.C. § 1415(j); 34 C.F.R. § 300.518(a), (d).  A plaintiff may seek a "stay put" order in the district court even if "stay put" issues were not litigated in administrative proceedings.  See N.D. v. Haw. Dep't of Educ., 600 F.3d 1104, 1110-11 (9th Cir. 2010).

III.     FACTUAL AND PROCEDURAL BACKGROUND.

E.Y. is a seventeen-year-old boy with autism.  See Administrative Record on Appeal ("ROA"), Respondent's Ex. 2, at EY 008; Transcript of Proceeding ("Transcript") at 8:03.  There is no dispute that E.Y. is eligible to receive special education.

E.Y. currently attends Variety School ("Variety"), a private school that he has attended since he was eight years old. See Decision at 4.   In accordance with E.Y.'s January 2009 IEP, the DOE planned to move E.Y. from Variety to his home public school, Kaimuki High School ("Kaimuki"), as of the 2010-11 school year.  Id. at 5; ROA Respondent's Ex. 4 at EY 028.  Until being placed at Kaimuki, E.Y. had been eligible for reimbursement of his tuition at Variety.  See Transcript at 51:7 - 52:6.

A.     IEP Meeting on January 13, 2010.

On December 31, 2009, the Care Coordinator at Kaimuki, Cecelia Cambra ("Cambra"), contacted L.I. by telephone to arrange E.Y.'s annual IEP meeting.  Decision at 5; ROA, Respondent's Ex. 4 at EY 030.  E.Y.'s then-current IEP was to expire on January 16, 2010.  Decision at 6; ROA, Respondent's Ex. 4 at EY 030.  On January 6, 2010, Cambra sent L.I. a letter proposing four dates for the meeting, and inviting L.I. to opt for other dates.  Id.  The letter also stated that the IEP was due on January 16, 2010, and that if Kaimuki did not hear from L.I. by January 8, Kaimuki would hold the IEP meeting on January 13,

2010.  Id.  L.I. agreed to a meeting on January 13, 2010, at 2:30
p.m.  Decision at 7.

Once the meeting convened on January 13, L.I. informed
the IEP team that she had to leave at 4:20 p.m. to return to work
by 4:30 p.m.  See Decision at 8.  Based on previous IEP meetings,
L.I. thought the IEP team would finish within ninety minutes.
Id.  However, the IEP team had not finished developing E.Y.'s IEP
by the time L.I. had to leave.  Id.  The principal of Kaimuki
offered L.I. the option of either scheduling another meeting to
complete the IEP, or allowing the IEP team to continue without
L.I.  Decision at 8; Transcript at 65:1-6.  After Cambra agreed
to send L.I. a copy of the IEP and various documents and
information, L.I. opted to have the IEP team continue without
her.  Id.  The meeting continued for only about ten to fifteen
minutes after L.I. left, according to the only evidence in the
record on this point.  Transcript at 75:1-9.

On January 15, 2010, Cambra sent L.I. at least some of
the promised documents, including a copy of the completed IEP.
Decision at 12.  She also sent L.I. a letter inviting her to
discuss the IEP over the phone or to schedule another meeting for
that purpose.  Id.  L.I. did not contact Cambra to discuss the
IEP.  Instead, she sent Cambra a letter, dated February 2, 2010,
stating that E.Y. would be attending a private school for the

2010-11 school year because she did not think Kaimuki "would be best for him." Id. at 15.

B. Transfer Plan.

At the January 13 IEP meeting, the IEP team prepared a transfer plan for E.Y.'s move from Variety to Kaimuki. Decision at 9. Kaimuki planned to implement the transfer plan in three phases, but had not yet determined when the first phase would begin. Id. at 12; ROA, Respondents' Ex. 6, at EY 085. Commencement depended on L.I.'s provision to Kaimuki of signed consent forms that would allow Kaimuki staff to gather information and coordinate with Variety. Decision at 11; ROA, Respondents' Ex. 6, at EY 085. Cambra had sent L.I. the consent forms with the letter of January 6, 2010, and called to follow up, but L.I. had not returned the forms by January 13. Decision at 6, 8; Respondent's Ex. 4 at EY 030. Although E.Y.'s January 13 IEP took effect on January 14, 2010, the DOE could not begin implementing the transfer plan before receiving the consent forms. Decision at 11. At the administrative hearing, Cambra testified that the DOE still had not received the consent forms. Transcript at 69:23 - 70:3. Cambra sent L.I. the proposed transfer plan with the January 13 IEP on January 15, 2010. Decision at 12; ROA, Petitioners' Ex. 1 at 001.

C.    Administrative Hearing.

L.I. filed a due process complaint regarding E.Y's
January 13 IEP on August 16, 2010.  ROA at 2-5.  L.I. contended
that the IEP was flawed on three grounds: (1) although the
parties recognized that E.Y.'s transfer from Variety to Kaimuki
necessitated a transfer plan, E.Y.'s transfer plan could not be
implemented on January 14, 2010, when the January 13 IEP took
effect; (2) the DOE had denied L.I. an opportunity to participate
in the January 13 IEP meeting by continuing the meeting without
L.I. when she was unable to stay; and (3) E.Y.'s teachers had not
participated in the IEP meeting because the DOE had not informed
them about the meeting or invited them to attend.  Id.  L.I
sought payment for E.Y.'s continuing expenses and tuition at
Variety, reimbursement for E.Y.'s past expenses and tuition at
Variety, and attorneys' fees.  Id.

Special Hearings Officer Rodney A. Maile, of the Office
of Administrative Hearings, Department of Commerce and Consumer
Affairs, convened a hearing on October 15, 2010.  Decision
at 3-4.  A continued hearing was held on October 20, 2010.  Id.
Two witnesses testified:  L.I., on her own behalf, and Cambra, on
behalf of the DOE.  See Transcript at 7:15-18, 60:7-11.  On
November 11, 2010, after reviewing and considering the evidence,
arguments, and record of the proceeding, AHO Maile issued his
decision.  Decision at 4.  The AHO rejected all three of L.I.'s

9

grounds for relief, concluding that she "did not prove by a preponderance of the evidence that the January 13, 2010 IEP was improperly conducted, or that the January 13, 2010 IEP was defective." Decision at 21. L.I. now appeals the AHO's decision regarding two of the three issues raised before the AHO: the absence of a transfer plan as of January 14, 2010, and the denial of an opportunity for L.I to participate at the IEP meeting.

IV.     STANDARD OF REVIEW.

Any party aggrieved by a decision of a due process hearings officer under the IDEA may appeal the findings and decision to any state court or a United States district court. 20 U.S.C. § 1415(i)(2). The party challenging the administrative decision has the burden of proving deficiencies in the administrative decision. Seattle Sch. Dist., No. 1 v. B.S., 82 F.3d 1493, 1498 (9th Cir. 1996).

When evaluating an appeal of an administrative decision, a court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C).

Under the IDEA, district courts review the hearings officer's conclusions de novo. Ashland Sch. Dist. v. Parents of Student E.H., 587 F.3d 1175, 1182 (9th Cir. 2009). However, de

10

_novo_ under the IDEA "carries with it the implied requirement that
due weight shall be given to [the administrative] proceedings."
_Id._ (quoting _Rowley_, 458 U.S. at 206). A district court "must
give deference to the state hearing officer's findings, . . . and
avoid substituting its own notions of sound educational policy
for those of the school authorities which it reviews."
_Id._ (internal quotation marks, modifications, and citations
omitted). A court must consider the findings carefully and
respond to the hearings officer's resolution of each material
issue. _Capistrano Unified Sch. Dist. v. Warternberg_, 59 F.3d
884, 891 (9th Cir. 1995). The court, however, is free to accept
the findings in part or in whole. _Id._ Greater deference is
appropriate when the findings are "thorough and careful." _JG v.
Douglas County Sch. Dist._, 552 F.3d 786, 793 (9th Cir. 2008).
The Third Circuit has stated that "special weight" is due when
the hearings officer has heard live testimony and "found the
testimony of one witness to be more worthy of belief than the
contradictory testimony of another witness," and "a District
Court must accept the state agency's credibility determinations
unless the nontestimonial, extrinsic evidence in the record would
justify a contrary conclusion." _L.E. v. Ramsey Bd. of Educ._, 435
F.3d 384, 389 n.4, (3d Cir. 2006) (citations omitted).

V.          <u>ANALYSIS.</u>

          A.   The Court Defers to the Hearings Officer with
               <u>Respect to His Factual Findings.</u>

          Neither party challenges the factual findings made by
the AHO, and, deferring to him with respect to those findings,
the court accepts those findings.  The AHO conducted an
evidentiary hearing, and the Decision set forth findings of fact
and justified its conclusions of law with reference to the
factual record presented over the two-day hearing.  No party
suggests the AHO was partial to either side.  Although the AHO
considered the evidence from both sides, in some instances he
gave more credence to one party.  <u>See e.g.</u>, Decision at 9
(acknowledging L.I.'s testimony that she believed she only gave
the IEP team permission to "wrap up" the items discussed, but
suggesting that this statement was not credible because she did
not ask the IEP team if or when the next IEP meeting would take
place).  The transcript demonstrates that the AHO was attentive
during the hearing, as he actively questioned L.I. when she
testified as a witness.  <u>See</u> Transcript at 39:14 - 44:23.
Accordingly, the court gives deference to the AHO's Decision.
<u>See</u> <u>R.B. v. Napa Valley Unified Sch. Dist.</u>, 496 F.3d, 932, 942-43
(9th Cir. 2007) (findings are considered thorough and careful
when the officer participates in witness questioning and prepares
a decision that contains a complete factual background as well as
a discrete analysis that supports the ultimate conclusions); <u>see</u>

also <u>J.W. v. Fresno Unified Sch. Dist.</u>, 626 F.3d 431, 440-41 (9th Cir. 2010) (according "due weight" and "particular deference" to a decision that followed a ten-day hearing involving active questioning by the administrative law judge, contained detailed factual background and analysis, and explained legal conclusions thoroughly).

> B.   The IEP was Not Substantively Flawed Even Though it Lacked a Transition Plan That Could Be <u>Implemented on January 14, 2010.</u>

L.I. maintains that E.Y.'s IEP was substantively flawed because it failed to include a transition plan.  According to L.I., because the DOE agreed and anticipated that E.Y. required a transition plan to move him from Variety to Kaimuki, a transition plan was required for the IEP to meet E.Y.'s unique needs.  The DOE's position is that the IEP team did discuss and prepare a transition plan at the IEP meeting, but could not implement it because L.I. did not provide the requisite consent forms.  The DOE further notes that a transition plan is not a required component of an IEP.

The AHO concluded that the IEP was not deficient.  He based his conclusion in part on his finding that the IEP team had created a transfer plan, but "because of Mother's failure to provide the required Consent forms to [Kaimuki], [Kaimuki] could not take further steps to begin the process of transferring

Student to [Kaimuki]." Decision at 16. Notably, L.I. does not challenge this factual finding.

The AHO also noted that "a transfer plan is not a required component of an IEP." Id. Although the AHO recognized that a transfer plan may be relevant to assessing whether an IEP is deficient in that "it may have some bearing on whether the IEP could be successfully implemented," this was not the case with regard to E.Y.'s IEP, as "there was no credible evidence that [L.I.] objected to the terms of the Transfer Plan." Id.

The court agrees with the AHO and the DOE that the January 13 IEP was not rendered deficient by failing to include a transition plan that could have been implemented on January 14, 2010. As the AHO remarked, "[I]t is . . . somewhat paradoxical that [L.I.] is complaining about the time for the implementation of the Transfer Plan as of January 14, 2010" when L.I. herself caused the problem. Decision at 16. That is, the DOE could take no further action without getting the consent forms from L.I.

This court has previously refused to read the "stay put" provision of the IDEA as providing a remedy to a parent for an alleged IDEA violation that she herself caused. A.R. v. Hawaii, Dept. of Educ., Civil No. 10-00174 SOM/RLP, 2011 WL 1230403 (D. Haw. Mar. 31, 2011). In A.R., the parent alleged that the untimeliness of her son's IEP constituted a procedural violation of the IDEA. Id. at *2. The hearings officer

14

disagreed, declining to conclude that the DOE had procedurally violated the IDEA because the untimeliness resulted from the mother's obstruction, delay, and lack of cooperation. <u>Id.</u> at 11. This court affirmed the hearings officer, ruling that "when a parent causes the untimeliness and then, without disputing that she caused the untimeliness, appeals an adverse administrative ruling only on the ground that she must prevail as a matter of law whenever an IEP is untimely, the parent may not prevail in the appeal." <u>Id.</u> at *15. In the present case, L.I. similarly does not dispute that she caused the alleged violation by not providing the consent forms, but asks this court to nonetheless fault the DOE. The court declines to do so.

Furthermore, under the IDEA, the DOE is not required to provide a transition plan in an IEP whenever a child moves from a private to a public school. The IDEA does provide that an IEP include transition services for a child age sixteen and above to assist the child in reaching "appropriate measurable postsecondary goals based upon age appropriate transition assessments related to training, education, employment, and, where appropriate, independent living skills[.]" 20 U.S.C. § 1414(d)(1)(A)(i)(VIII). However, transition services must be included in an IEP only in certain circumstances such as when a child is moving from school to post-school activities, to post-secondary activities, to vocational training, etc. "[T]he

15

statutory provision of the IDEA specifically addressing transition services does not mandate such services when a transition from private to public school takes place." <u>James M. v. Hawaii, Dept. of Educ.</u>, Civ. No. 10-00369 LEK, 2011 WL 1750718, at *11 (D. Haw. Feb 25, 2011) (quoting <u>B.B. v. Hawaii, Dept. of Educ.</u>, 483 F. Supp. 2d 1042, 1056 (D. Haw. 2006) (citing <u>L.M. v. Dept. of Educ.</u>, Civ. No. 05-00345 ASK/KSC, 2006 WL 2331031, at *16 (D. Haw. Aug. 9, 2006))). As E.Y. was to move from Variety, a private school, to Kaimuki, a public school, the DOE was not obligated to include a transition plan in the IEP. <u>See</u> <u>James M.</u>, 2011 WL 1750718, at *11 ("Given that James M. was to be moved from Loveland, a private school, to Kahuku, a public school, the School District was under no obligation to provide transition services for James M.").

Although an IEP's inclusion of a transition plan is not explicitly required by the IDEA, parties may sometimes agree that a transition plan is important to facilitate the child's transfer to a new school. <u>See</u> <u>B.B.</u>, 483 F. Supp. 2d at 1067 (citing <u>L.M.</u>, 2006 WL 2331031, at *16). In the present case, the DOE felt that a transition plan was important to ensure a "nonthreatening" transition to Kaimuki. Transcript at 66:17 - 67:7. But the DOE's identification of a transition plan as important does not render the IEP deficient just because the DOE could not implement it on the same day the IEP was to take effect. This is

particularly true under the circumstances in this case, as the DOE required additional cooperation from L.I., and the IEP took effect the day after the IEP team developed both the IEP and the transition plan. Moreover, it is of no consequence that the DOE could not implement the transition plan on January 14, 2010, because the DOE did not expect to start the transfer process until after that date. <u>See</u> Decision at 16; Transcript at 67:12-19. The January 13 IEP was thus not deficient based on the lack of a transition plan that could be implemented on January 14, 2010.

> C. The DOE Did Not Procedurally Violate the IDEA When, With L.I.'s Consent, it Continued To Conduct the IEP Meeting Without L.I.

L.I. argues that the DOE procedurally violated the IDEA by continuing to conduct the IEP meeting on January 13, 2010, in her absence when she had to return to work, thereby denying her an opportunity to participate in developing the IEP. L.I. does not substantively challenge the IEP.

Particularly relevant to this issue is the AHO's finding that L.I. "gave the IEP team express permission to complete [E.Y.s'] IEP on January 13, 2010, prior to leaving the meeting before its conclusion." Decision at 19. L.I. does not challenge this finding. Although L.I.'s counsel stated at the hearing on this appeal that whether L.I. consented to continuing the meeting without her was "hotly contested" at the

administrative hearing, he conceded that the AHO's finding was not contested on appeal. The court thus accepts as fact that L.I. consented to the IEP team's completing the IEP meeting in her absence.

Concluding that the DOE did not violate the IDEA, the AHO stated: "in the absence of any specific statute, regulation, or rule that would 1) prevent a parent from leaving an IEP meeting once it is underway; or 2) require a parent to provide written consent in addition to oral consent to the IEP team in order for the parent to leave a IEP meeting in progress, the [AHO] is unwilling to create such a burden on [the DOE]." Decision at 18. The AHO's position, however, also rested on the unique circumstances in this case:

> Had Mother a) not given permission to the IEP team to continue without her; b) subsequently expressed her surprise or disagreement with the IEP team's completion of the January 13, 2010 IEP without [L.I.'s] consent; or c) requested another IEP meeting to further review the January 13, 2010 [sic], the Hearings Officer may have been inclined to decide this issue differently.

Decision at 18.

The court agrees with the AHO's conclusion that the DOE did not procedurally violate the IDEA. L.I.'s appeal is premised on an alleged violation that she herself caused. L.I. expressly consented to the DOE's completing of the IEP meeting without her. Yet now, without challenging any factual findings, she asks the

court to find the DOE liable for having done exactly what she said it could do. Like the AHO, the court declines to do that.

L.I. contends that, as a matter of law, "[w]hen a parent was unable to continue that meeting on 1/13/2010, the DOE was required to suspend that meeting. Continuing, even with approval of parent was a denial of FAPE." Plaintiffs' Opening Brief at 5, 7. The law, however, is far from being as "specific, detailed, and clear" on this point as L.I. claims. Id. at 5.

L.I.'s reliance on Shapiro v. Paradise Valley Unified Sch. Dist. No. 69, 317 F.3d 1072 (9th Cir. 2003), superseded on other grounds, by 20 U.S.C. § 1414(d)(1)(B), is unpersuasive. In Shapiro, the Ninth Circuit indeed emphasized "the importance of parental participation in the IEP process," stating that the IDEA requires parental presence at IEP meetings "unless they affirmatively refuse to attend." Id. at 1077. But the Ninth Circuit's holding that a school district had violated the IDEA by holding the IEP meeting in issue without the parents turned on facts distinguishable from those present here. The school district had scheduled the IEP meeting for a date when the parents could not attend; when the parents asked to reschedule, the school district refused. Id. at 1075. The Ninth Circuit held that it was the convening of the meeting without any attempt to accommodate the parents that violated the IDEA, not the mere holding of the meeting without the parents. Id. at 1078. Here,

the DOE gave L.I. the option of rescheduling the meeting, but L.I. chose to have the IEP team continue without her, orally giving express consent to its doing so.

Aside from Shapiro, neither party provides any case in support of its position. Nor has the court located any controlling authority on point. However, the Eighth Circuit and the Unites States District Court for the Northern District of California have held that school districts did not procedurally violate the IDEA when they continued IEP meetings when the parents were no longer present. See K.E. v. Independent Sch. Dist. No. 15, 647 F.3d 795, 806 (8th Cir. 2011); L.S. v. Newark Unified Sch. Dist., No. C 05-032421 JSW, 2006 WL 1390661, at *7 (N.D. Cal. May 22, 2006).

In K.E., the Eighth Circuit found no IDEA violation when the parent, not the district, refused to participate in the IEP process, and, by doing so, "truncated her own procedural right." 647 F.3d 795, 806 (8th Cir. 2011) (citing Blackmon v. Spring R-XII Sch. Dist., 198 F.3d 648, 657 (8th Cir. 1999)). The school district had scheduled the IEP meeting in issue four times, but the parent had cancelled two meetings, had walked out of one meeting over a dispute about the agenda (before the team reached the substance of the meeting), and did not attend the last meeting despite the rescheduling of the meeting to an agreeable date and time. Id. at 801.

In L.S., the Northern District of California rejected the parents' argument that the school district had deprived them of the opportunity to participate in the IEP formulation process by not discussing all of their child's placement possibilities at the IEP meeting in issue. 2006 WL 1390661, at *5, *7. The court found "no fault" on the part of the school district because it was prepared to discuss placement options, but the parents chose to leave after only thirty minutes, before the district had the opportunity to discuss those options. Id. at *7. In both K.E. and L.S., the continued running of meetings without the parents did not constitute procedural violations given the parents' voluntary decisions not to participate.

This court understands that L.I. may have felt compelled to leave the IEP meeting because of her work obligations. L.I. may therefore view her absence as involuntary. Even if her absence was involuntary, what the record indicates was voluntary was L.I's agreement that the team could continue with the meeting after she left. This court declines to find a procedural violation when L.I. chose to allow the IEP meeting to continue in her absence. To find a violation would render L.I.'s consent meaningless. The court is not persuaded that the IDEA requires a school district to ignore a parent's consent and to stop the meeting. Underscoring the untenable position L.I. would put the DOE in by reading the IDEA as requiring that it

ignore her consent is L.I.'s failure to clearly articulate what it was that the IEP team decided in her absence that went beyond what she had agreed the IEP team could discuss in her absence!

VI.     <u>CONCLUSION.</u>

The Decision of the AHO is AFFIRMED with regard to whether E.Y.'s January 13, 2010, IEP was substantively flawed because it lacked a transition plan that took effect when the IEP did, and with regard to whether the DOE procedurally violated the IDEA by continuing to conduct the January 13, 2010, meeting without L.I.

The court also notes that "stay put" is not an issue that has been properly raised before this court.  The only mention of "stay put" is in the first paragraph of L.I.'s opening brief, which asserts without citing any authority that "the Defendant is required by law[,] to fund Students [sic] current private placement" under the "stay put" provision.  Plaintiffs' Opening Brief at 1.  L.I. cannot merely assert that the "stay put" provision applies and expect that the court will rule on the matter, with the court doing all the research and providing reasons that L.I. never bothers to advance.  L.I. has counsel, and counsel's role is surely more than to demand relief without reasoning or authority.  If L.I. would like a "stay put" order, she must file a separate motion and submit proper briefing of the legal merits of her motion.  Of course, if the DOE argees that

the "stay put" provision applies, there is no dispute for this court to resolve with respect to that matter.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, November 29, 2011.



 /s/ Susan Oki Mollway
Susan Oki Mollway
Chief United States District Judge